Marcia Morrissey John Grayley Richard Allen Benson Before we start taking the time, will you be sharing time? I will be, Your Honor. My plan is to spend about 20 minutes talking about penalty phase infective assistance. Mr. Grayley will then have five minutes to address the statement claims and any uncertified claims, and hopefully we'll have five minutes for rebuttal. Okay. Thank you. Thank you. Your Honor, at the penalty phase argument, trial counsel held up a picture of Richard Allen Benson as a boy on the Buchanan farm. He was with a cow, and he was feeding the cow a bottle. And trial counsel asked the jury, how did this darling little boy come to be in this courtroom today? He then told the jury that he could not answer that question, but he could have. There was a powerful narrative about how Mr. Benson came to be in that courtroom that trial counsel failed to investigate. Well, one of the things that appears at the time of this trial, Mr. Benson did not recall the mistreatment at the Buchanan ranch. So why doesn't that excuse trial counsel's failure to investigate his treatment? Mr. Benson, Your Honor, did not recall and still does not recall what he experienced at the Buchanan ranch. The graphic details that we have about what happened there are from his brothers. Well, but his brother did testify at the penalty phase, right? Yes. And there was no indication his brother testified about certain things, but he didn't testify that either. So it's not as if the brother wasn't identified. So I guess what I'm getting at is how can he be faulted if you have all of those people there, but they're not coming up with anything? Well, if you step back, there weren't all the people there. They only found two of the Mr. Benson, who did testify at the case, told his investigator that he had been brutally sexually assaulted by David Buchanan from years 9 to 12 and that he believed his brothers suffered that same abuse. When did he say that? He said that to Dorothy Ballou, the investigator, who interviewed him before trial. He came up. Brad Benson couldn't answer a question that wasn't asked, and I think that is the problem. Trial counsel was on notice that Mr. Benson had a history of severe abuse and sexual victimization. Rich Benson. Mr. Benson had a severe history. I'm sorry, Your Honor. Mr. Benson had a severe history of... Are you talking about Brad Benson or are you talking about Richard Benson? I'm talking about... I'm sorry, Your Honor. I'm talking about Brad Benson and I'm talking about my client because he... Which one are you talking about as having a severe history? Brad Benson or your client? Brad Benson. Brad Benson. Okay, fine. I'm sorry. Why didn't trial counsel ask about that abuse when Brad testified? Trial counsel had decided early on... Well, I can't answer that question. I don't know. I do know that he was aware from a number of sources. Dorothy Ballou, his investigator, told him that Richard Benson's childhood memories were incomplete with gaps and she... The best thing you have going for you is Mr. Kellogg or Dr. Kellogg's declaration saying that he went down to, if I understood it correctly, he went down to Santa Barbara at the time of the trial, the night before or the day before trial, and he suspected that Richard Benson had been sexually abused as a young child and said as much, said that to trial counsel. Yes, you're absolutely right, Your Honor. He said that to trial counsel. He told trial counsel that you need to investigate further if this jury is going to have an accurate picture of your client and he asked permission to interview Mr. Benson. And that was denied him by trial counsel. That was denied him by trial counsel. And do we know the reason? Is it in the record? Why? It is not in the record, Your Honor. Do we know, as Ms. Ballou, the investigator, in her first interview with Brad, which took place during the penalty phase, if she ever asked Brad Benson if Mr. Richard Benson, our petitioner, was sexually abused? I don't know. I don't have the actual notes of Ms. Ballou's interview. I know that Brad Benson told her that he had been brutally sexually assaulted. I'm sorry. You're going to need to say, Brad Benson told her that he, being who? Brad Benson told Dorothy Ballou that Brad Benson had been sexually assaulted. I'm just very curious. It would seem to be the obvious question to ask whether or not the petitioner had been abused, as you note and as you argue, because it goes to the heart of mitigation. So did she ask that? I can't answer that question. But there's nothing in the notes to support that she did? Well, no. We have the information that he provided. What's the answer to my question, then? The answer is that Brad Benson told Ballou that he, Brad Benson, had been violated repeatedly. No, that's not my question. My question is, it would seem obvious that the investigator, Ms. Ballou, would have asked whether or not the petitioner, his brother, had been sexually abused. And Brad Benson told Ms. Ballou that he believed that his brothers likely suffered. At the time or later? At the time she interviewed him prior to trial. Prior to trial. Prior to trial. And she, Ms. Ballou, in turn, related this information to trial counsel and urged him to investigate abuse. If she did ask that question, why isn't that in her declaration? I've gone through her declaration. I think it's fairly comprehensive. It doesn't state, at least you can look at it during the break here, but I don't believe I saw that she said that she asked Mr. Brad Benson regarding the abuse at that time of Richard Benson. It's very unclear. And so I'm just, if you have it somewhere, I'd like to know. Also, she did ask the question, and Brad said that Richard Benson, the petitioner, was not abused. But you say he says he was abused. Brad said that he believed his brothers. Where is that in the record? That is in the declaration of Brad Benson. It is in the excerpts of record. I can get it for you. But it's in his declaration that he told Ms. Ballou that the petitioner had been sexually abused. But does it say when he told her that? It would have been pretrial because that's when she had her contact with him. I know that the investigator told counsel that there was, she was suspected of abuse that needed to be investigated and asked for a continuance of the trial, which was not forthcoming. The penalty phase, it looks like it began on March 11th of 1987, and the record indicates that it lasted about eight days. That's correct. The jury, apparently the return of a death verdict on March 26th, 1987. Do we know how many days the jury deliberated exactly? Yes, I have that information, Your Honor. The deliberations were not long. May I? It was a mere hour if I recall. Here it is. They went out to deliberate on March 25th. They retired at 2.30. They recessed at 4.30. They again deliberated on March 26th, began at 8.30 a.m., and there was a verdict at 11 a.m. I have some questions regarding trial counsel's interaction with Mr. Benson. Do we know, or maybe you can tell me, how often trial counsel met with Mr. Benson? We do not know that, Your Honor. And do we know if trial counsel ever asked Mr. Benson, the petitioner, if he was sexually or physically abused while he was at the farm in Petaluma? We do not know that, Your Honor. There aren't time records. Sometimes people keep billing records, but we don't have that in this case. We do know, and it's in the record from the declaration of Dale Benson and also within Ms. Ballou's declaration, that trial counsel was very uncomfortable with this case, couldn't deal with Mr. Benson's family, and it doesn't seem to me that there was the communication that would have led someone to reveal molestation as a child. So, all right, if the decision that we're reviewing under EDTA found no IAC, correct? The only reason decision in this case is from the district court. This was summarily denied by the California Supreme Court. From the state court, but it's considered on the merits. Yes. So we have to look at it under EDTA review, correct? That's correct. And so on the merits, we have to look, and if they said that there was no IAC under Strickland, that means that they looked at it on the merits of prong one and prong two, and so we have to look at whether it's unreasonable, and we have to give all inferences. So that's your standard, right? That's correct. So, why couldn't they have found on this record, in light of the, I think that if you do capital cases, you could even say these facts are bad for capital cases, and also he had four prior convictions of quite significant, they were significant relative to the offense at hand, and also his confession was quite dark in terms of the things that he said about it being a pedophile's heaven and everything along those lines. Why doesn't EDPA require that there couldn't have been any prejudice under the horrific facts of this particular case? I will address that, Your Honor, and I think that the decision that trial counsel could reasonably forego explanatory case-related mitigation in favor of a penalty-based presentation that basically said, my client was a nice little boy, and I don't know how he got to be here in this courtroom, is objectively unreasonable. Well, he did say, though, that, well, I mean, of course, your client didn't claim, he didn't, your client didn't remember what happened at the Buchanan Ranch, and that I think that there's one way of looking at it in terms of, I mean, Brad, I'm just going to say Brad, not because I'm trying to be, just so that we don't have confusion, Brad did testify, and Brad doesn't, there doesn't, you know, he's not saying that relative to the Buchanan Ranch. So he's portrayed not as having had, the petitioner is portrayed as not as having had a good life, in fact, as having a horrific child life, but more with a dad and an alcoholic father that was abusive and any number of things, so. But he was only with his father for one year. One year after they left the Buchanan Farm, they spent with their father until Child Protective Services took those children away. So he was relying on one year of, you know, deprivation, one year with a neglectful parent, to mitigate what are acknowledged to be very, very challenging times. Well, I guess so, I guess there's kind of a, defense counsel's in a difficult position from this standpoint because when you have a guy that's got four of these priors and you also, let's just even assume that, I think a lot of people suspect that someone that commits these type of crimes has had some sort of history because that just, the statistics seem to bear that out on some level. But Brad doesn't, didn't do what your client did in terms of, and didn't have the same history, even though Brad endured things like that. So there's always a danger of sort of solidifying how bad someone, you know, not all people react in the same way to abuse. People are abused and still live law-abiding lives. People like your client that are abused have four prior convictions for quite significant kidnapping, molest, and then the facts of this particular crime. And it doesn't necessarily put them in a better light to say, okay, now you know why he is the way he is, but not everyone that has this happen becomes your client. So it's kind of a catch-22. It is a catch-22, but as Richard Benson, my client, had specific vulnerabilities that his brothers didn't have. He had fetal alcohol syndrome and fetal effects. So he had suffered the physical abuse. He was beaten at the farm, and Brad would say he was beaten more than the others. He was hit in the head. He has a palpable ridge on his head that corresponds to one time when Brad hit him with what's been described as an hatchet or an ax. He bears the scars of that. He has organic brain damage. He has organic brain damage, and evidence of his neurological deficits were present from early childhood on the farm. When he was punished, he would withdraw. He would sit on the ground. He would eat dirt and live bugs. And those organic deficits manifested themselves throughout his brief time in school. Now, Your Honor, I'd like to talk about why. Remind me on your timing. Did you want to give to your one? Do you want to turn over? I want to turn over in about 20 minutes into my argument. Okay. All right.  Okay. I just want to very briefly about the prejudice prong where there is no double deference. The explanatory nature of this mitigation makes it compelling. This mitigation addresses both the crimes and the four prior convictions. But Your Honor said, you know, we all know that people who are molested go on to molest. And this mitigation, while not excusing Mr. Benson's behavior, in no way excusing it, certainly makes it understandable. These are horrific crimes. But Mr. Benson lived a horrific life, and that is what led to these crimes. And the jury needed to know that in order to have any feeling of who this person is who sat in that courtroom. And they didn't hear that. The Supreme Court has emphasized that explanatory mitigation is especially valuable. In Porter v. McCollum, where there was a death of an ex-girlfriend, among others, the court said that the relationship, the mitigation. But I guess that we have to look at what counsel did at the time. And he did hire Ballou. And Ballou is the person that you're putting forward as the expert of all experts. And she doesn't uncover this in that time period. And, you know, no one tells it. You know, he did hire her. He did have them looked at by a doctor. He did call the brother. You know, so you can't entirely hindsight what we know today as to evaluating what he did then. Look, what he did then is present a very weak, meager case. But what if no one would have said that then? If no one would have said that then, how can a lawyer be faulted for not uncovering it? No one, we don't know that no one would have said it, Your Honor. No one was asked. Ms. Ballou wasn't given time to investigate. And I don't think Ms. Ballou is our expert. She is knowledgeable, but we have Terry Kellogg as well. But one of the problems with Ms. Ballou is that she keeps saying in her declaration that she needed more time to do several avenues of further investigation. And she doesn't say what they were. We have no idea what she had in mind as far as we can tell. She may have wanted to do an investigation which had nothing to do with this. We don't know. Well, I apologize for that, Your Honor. There's no reason for you to apologize. The question is Ms. Ballou didn't have anything in mind. Now she's saying, oh, well, I would have done some further investigation along former sexual abuse lines. But that wasn't what she said in her declaration. Well, I think at the time Ms. Ballou said that she suspected abuse, that she strongly urged counsel that she needed to investigate abuse, that she had received reports of abuse. She doesn't say that in her declaration. There's nothing about specific avenues of abuse investigation in her declaration. But you only have 10 minutes. Do you want to turn it over to her? Yes, I will turn it over to Mr. Grayley. Thank you. Okay. We'll make sure that we have all our questions answered. Good morning. Good morning, Your Honors. John Grayley on behalf of Mr. Pence. I just want to briefly mention. Speak up, counsel, would you please? Sure. Mr. Benson was brought to court four times, denied the right to see a judge so that officers could investigate their case and obtain incriminating statements from him. There is no reasonable jurist that would say that that type of behavior meets the requirements of Gerstein. You have to be brought to court within a reasonable amount of time. He was actually brought to court. Why would he have to be brought to court, counsel? There are two reasons he could be brought to court. One was for finding that there was no probable cause and he could be released. The other is to meet his counsel and confer with counsel. Let's take each of those. As far as coming to court and being subject to a probable cause hearing, first of all, he was being held on a parole hold so he didn't have to show up. Second, if he had been there, is there any conceivable way that given his confession that was done within a day of his arrest, he wouldn't have been held on probable cause? Well, they were going to arrest him on that murder if he did somehow get off on a probable cause. So the answer is no, he wouldn't have gotten off. He wasn't going anywhere. As far as attorney consultation, he specifically was Mirandized before his confession and he turned down attorney several times. So what is the causal nexus between delay of arraignment and cause of constitutional error? We have it in the record. We have it in the record. When he first got into court and first got to see a lawyer, what does he say? He says, I think I need a lawyer. Now I understand what I'm facing. Now I understand the consequence. Now I know I'm in really big trouble. I do need a lawyer. So that is why one has a lawyer and one doesn't rely on investigating detectives to tell you what a lawyer can do for you because they don't have to do that. But right in the record, his first appearance in court, he tells us exactly what the problem is, exactly what the problem is. Assuming that Dr. Gordon, because you have a combination of things that happened that you attribute to the delay and you say the delay was significant. But let's just assume there was a delay. What's the remedy you seek? I mean, because still within 48 hours, he gave some incriminating statements. So I'm not quite sure what that gets you. Well, first of all, McLaughlin is an outside limitation. It's not a you get 48 hours to do what you want. In this case, this is particularly important because in this case, he's actually brought to the courthouse before he confesses. He's actually brought there and told he can't and taken back. Now, what does the defendant think when that happens? I'm not going to get to court until I talk to somebody. There's nothing here for me. And this is a gentleman who knows he's being pulled back from court. He's been to court. I'm going to ask the state this question, too. But do we know why he was taken? And then it's unclear to me exactly what was going on. Well, there's a lot of things that are unclear in the record, including the parole hold. We've got records that say there was none at the jail. And the respondent comes up with one. And we've got files missing mysteriously from the parole officer. But he admits it. I'm sorry? Your client admits that he was on parole. Oh, yeah, he was on parole. But the question is whether a hold was even put in place because there's no records of that. Well, did the court find that there was a parole hold? The district court did. The district court did. The district court said that our evidence that questions a parole hold is negative evidence, so therefore it should be discounted. At the time, the probation officer testified, apparently at some deposition, that he had placed a parole hold on him even though there was no document to support it. But I guess back to my question, it sounds like they were taking him back and forth, which there's something not right with that. And I agree with you. The question is, is there anything that can be the basis for his relief at this point that you're seeking? Well, the relief in Anderson is the suppression of the statements that were obtained as a result. That's why they're delaying them. That's why they're holding them, to gather evidence. Subsequent. Subsequent. He gave those statements that were very incriminating, and maybe not all the details. Let's say you take out all the details to Dr. Gordon, but he gave a lot of really terrible statements to the first two investigators. So I'm trying to figure out where you land, even if we acknowledge there was a McLaughlin violation. Well, none of those statements come in then, if there's a McLaughlin violation. His initial statement within 48 hours? His initial statement was after he had. How do you understand that? His initial statement was already after he had been brought to court and denied his right to appear before the judge. Was it within 48 hours? He was brought to court within 48 hours but denied the right to see a judge. I know, but he gave statements within 48 hours. That is correct. His first statement was within 48 hours, but, again, the 48-hour limit is an outer limit. We've already reached the McLaughlin point. He's already in court. They're already denying him the right to be in court. I think what was going on here, and I tried to get discovery in this, is there was a consent order that required them to bring prisoners to court. A lot of counties were under those kinds of things. Is this in the record, or are you just speculating on this? Well, there is a reference to it in the record, and Detective Boltz says we have to bring people to court because there's some kind of procedure, he refers to it. And when Mr. Benson says that's tricky, tricky what you're doing to me, we have to bring them to court. There's some rules that require the court to do this. So here's what they do. They bring them to court, but they don't let them see a judge. That's their way around it so they can continue to do their investigation. Now, parole hold has nothing to do with the Stone v. Palabar. That's disposed of under Anderson. The parole hold is a question of whether or not he was restrained in violation of Durston. The only restraints that are allowed, according to McGoughlin, are exceptional circumstances. Parole hold is not one. It's an independent operating procedure. The next day it could be gone. The next minute it could be gone. It wasn't even in place as our position. Thank you. All right, thank you. We'll have the full five minutes for rebuttal. Good morning, and may I please report? Good morning. My name is David Glassman. I represent the respondent. I will first discuss the allegedly delayed arraignment and then move to the penalty phase. Unless the court has an interest in me proceeding differently, I'm happy to do whatever the court would prefer. That makes sense. Go ahead. Then I will proceed to the delayed arraignment claim first. First of all, this is a nonexistent claim as a matter of law. Why? Because there is no authority for the basic claim asserted by the petitioner, namely that a parolee, one who is indisputably subject to the restrictions of parole, can avail himself of the Riverside County decision regarding a 48-hour arraignment. There is no such case. The Supreme Court has indicated in the Powell v. Nevada case that we cite that the remedy for such a violation, even when it does apply. Let's talk about that a little bit, but I don't want to spend too much time with that. There it was that he did not have his hearing within 48 hours. Here, you're going to tell me that somebody can stay in custody for six days and not be told that that's why they're being held by a judge. That's not what Stone v. Powell says. It says that there's no urgency to resolve the probation violation within 48 hours, but here it's like just being put on notice. What in the Sam Hill was going on here? Why was he taken to court a period of time, I think three or four times over these six days, and he never saw a judge? The record, as I understand the record, the record does not clearly indicate what the purpose of these court visits were, what the source of some confusion was. But what there is no evidence of, Judge McGeehan, zero evidence, is their theory, their theory that he was withheld from court to obtain a statement. And as has been pointed out, when he is arrested on the Stang kidnapping, not on the murder, and he is questioned by the officers. He is not making some statements about the murder. He's not murderers, pardon me. He is explicitly confessing to everything well within 48 hours. I mean, I think it's undisputed by you, the State, that when Vincent Folley did see the judge, he learned he was subject to the death penalty and asked for counsel. Is that correct? That is not what he originally said. What he originally says when he goes to court the first time is what he has been telling the officers repeatedly in the interrogation. When you say the first time, what are you saying as his date of the first time? And in fact, to me, the record on that, because I thought that's new. I'm referring to the January 14th arraignment.  And what does he say at that point? He says that he doesn't want counsel. He wants to waive counsel. And that is exactly what he has told the police officers repeatedly, which actually, even though we aren't discussing it today, goes to the admissibility to confession. And the January 14th was an arraignment on the kidnapping or an arraignment on the murder? Murderers. It is an arraignment on all of the counts, as I recall, which is the four murders as well as the kidnapping. But the point I want to make with respect to the – So then when does he say that, oh, I realize now the death penalty. Was he not informed about the death penalty on the day of his arraignment? Maybe I'm confused with respect to the record, but he does make a statement at one point to the judge. I thought it was at his first hearing when he learned that he was subject to the death penalty. The transcript reference, which I believe is January 14th, that I have is 1454 of the underlying transcript. That may or may not be in these excerpts. He tells the court he wants a lawyer. He is informed it is a capital case and that a lawyer will be appointed for him. And at that point, to this question of the speediness of the proceedings, he waives a speedy preliminary hearing. So once again, when he is before a judicial officer and he has the opportunity, he is not interested in asserting that right. Well, there is a reference, though. When does he make that statement about now that I know that I'm subject to the death penalty, I think I need a lawyer. Your Honor, to give you, in my notes, I would have to review that to give you that precise statement. However, if we go back to what his issue is before this court, an issue that has been evaluated by the state courts and to which AEDPA deference applies, the question is what is the remedy that he seeks and what is the authority that allows it? And there is no authority. There's none from the Supreme Court. There is none from this court that would exclude a timely confession, even in the case of a delayed arraignment. He doesn't cite any case that remotely holds that any court has done that. Just to clarify, it looks like as soon as Mr. Benson learns that he may get the death penalty at the arraignment, which might be later in that record that you're – he asks for a lawyer after a break. He only says he doesn't want a lawyer before he knows about the death penalty. I think that's in that same part of that transcript, but it's at the arraignment that that comes to light. But, Your Honor, if we look, for example, at the recorded statement which precedes this, and now I will give you excerpts, references, he says, you cannot prevent me from pleading guilty in this matter, and that is my intention. This is 1295 of the excerpts. No matter how it's written up, I'm pleading guilty to it. I did it, and it showed me something about myself I cannot live with. Is that before he knows he's subject to the death penalty? Well, there is that exchange, which is part of the Miranda claim, in which one officer makes a reference to the death penalty. The other – that is that, quote, there is no death penalty here. The other officer corrects him, in our view, and then Benson says immediately, that doesn't matter to me. That doesn't matter to me. No, I understand. I'm talking about the arraignment. I understand what he said to the officers. And without belaboring it, there are probably at least ten sections in the excerpt where he says, for example, at 1255, I'm only telling you guys this because you can't stop it. Again, that's before arraignment. All right. But at arraignment, generally, the court would say what you're charged with and would also say that you're charged with certain special circumstances, which is what he was charged with. But the arraignment wouldn't at the initial stages. It would say you don't say, and then you're – because prosecutors don't usually decide if they're going to seek the death penalty until later in the proceedings necessarily. They charge the crimes and they charge the specials. But then maybe after the break, someone – maybe that's where he figured it out. I don't know. But if you arraign someone, you say you're charged with 187 of blah, blah, blah, four different counts, it's further alleged the special circumstances of, you know, blah, blah, blah, blah, blah. And you're informed of the maximum penalty possible under the law at the arraignment. In terms of his notice, there is no mistaking in 12 hours of statements that he makes, there is no mistaking that he is aware of the enormity of what has happened and that he is aware of the consequences to him. That permeates his conversation with these officers. They're talking about the murder of a young woman, the sexual assaults of her three – well, two of her children, the murder of all three. He is keenly aware and he says in 100 different ways that he is mindful of what has happened and that he has no reason to continue living at that point. I think that that is an explicit acknowledgment by him, that he could not be in a worse position legally and practically speaking. But you have that on the heels of an officer saying no death penalty here. And on the heels of that, you have Benson saying that doesn't matter. I am determined to talk to you about this and I will. I understand, but he still was not told until the arraignment that he really did have the death penalty. And when he realized that, he had made some pretty interesting statements that now that he knows that the death penalty, you know, applies, he's like a lawyer. So I'm just going – I want to know your best response. But let's talk about why you think Mr. Benson's counsel's actions were adequate. Are we now referring to the penalty phase, Your Honor? Correct. Before we get there, I'm going to ask – see if I got your position as expressed earlier correctly. What you're saying is that there's no Supreme Court case which clearly establishes the inadmissibility of a confession procured by a delayed arraignment. Yes, Judge Beyer, I'm saying that. In other words, you're talking about Musladin, the Musladin case, which reversed us and said there was no clearly established case allowing a jury to be affected by persons in the courtroom wearing badges contra the defendant. And as well as the provisions of the ADPA, correct? It's an ADPA defense. Okay, I've got that. Now, but just to elaborate, and then I will proceed, Judge McGeehan, to the other aspect of the case, and that is several things. First of all, no case holds that a timely confession, if you will, would be excluded. But my more fundamental point here is that – and there is testimony in the trial record, as I recall, in addition to the deposition that was taken of the parole agent that Mr. Grayley and I took many years ago in which he specifically testified that he had placed a parole hold on Benson. You know, the idea that, well, why aren't there more – why isn't there more documentation? That deposition was taken in 2001 or 2, if I recall. This crime is in 1986. So when we are piecing together the pieces here, 30 years down the road, there are limitations, I think, in what – but regardless, there's no reason to doubt the parole agent Martel's credibility. We know that he was involved in the case. We know that he issued a parole hold on the Stang kidnapping. My more fundamental point is if there's no paper trail, if the parole agent doesn't show up at work that day, the irrefutable fact in this case is that Benson was a parolee. Riverside County, in our view, doesn't apply to him. The 48-hour rule does not apply to someone whose parole status puts them in a different category. He does not have the same prompt arraignment right as a non-parolee. There are – as this court knows, there are various aspects of parole and how they limit someone's status, and that applies in this case. And if we're wrong, there's no case saying so. That is, no case has applied in any court, to my knowledge, this rule to a parolee. Now I'd like to turn to the penalty phase claim. Okay. I would also – and I question – when you go to the penalty phase, Yes, Your Honor. Counsel for Petitioner acknowledged that it is ed per review. Yes. But, okay, so what are we reviewing? And obviously I believe that the Supreme Court – that it's on the merits, but there isn't much there. So what – how do we look at that? And they're both saying – I mean, there's two prongs, obviously, of Strickland. First, whether, you know, they failed to investigate – if there is – I don't know if you want to say – and then also the prejudice prong. Yes. But we don't have any – so tell me how we look at that. So we are looking in this case at a claim – And then we've got Richter and Penholzer too. Yes. We are looking in this case at a claim of ineffective assistance of counsel in the penalty phase as raised and denied, ultimately, by a unanimous State Supreme Court on habeas corpus review. And as has been pointed out, although there is not a written decision, that is a merits evaluation that is entitled to deference under the ADPA issued by the same court that unanimously rejected Benson's direct appeal. So if they rejected it, does that mean that they looked at both prongs? I mean, do you – does the deference apply to both prongs? The deference applies to both prongs. And this is a case to start on the first prong. And the first prong, as we know under Richter, we're not simply now evaluating whether or not a lawyer should have done something differently. And I'm not going to acknowledge, when I move forward, that these lawyers should have done anything differently, as I will explain. But the question isn't whether or not their conduct was reasonable. The question under Richter, under the ADPA, is whether or not a State Supreme Court that evaluated this claim acted so unreasonably in deciding that a lawyer could have proceeded this way. Now, it's important, I think, to put aside the myth of what this penalty phase was. So counsel described the penalty phase as though on the heels of, even by death penalty standards, one of the more grotesque crime sprees that courts review. Counsel says, well, they showed the jury a picture, they suggested to the jury that there was an idyllic childhood, and lo and behold, Benson had been subjected to extraordinary abuse. I want to first clarify what actually happened in the penalty phase, because I don't believe that it's been accurately described. Benson is one of seven children born to two parents who are chronic alcoholics. The jury knows that his mother is a prostitute and a drug addict. The jury knows that he is abandoned almost immediately, as are all of his brothers. They're all shipped off. The jury knows that in the eight or so years that he is in this foster care situation in Petaluma on this farm, he sees his mother a total of three times. They know that when his father regains custody of these children, they become nomads. They move from one Skid Row hotel to another. They live in a chicken coop at one point. Their father remarries. He remarries an abusive alcoholic. They know that that is Richard Benson's past. They know that the state intervenes to take control or custody of these boys. Benson is placed in a different foster care situation when he is 11 years old. By 13, he's in prison. He's in the juvenile prison in California, the California Luth Authority. This is not the Disneyland farm outing that has been described as his childhood. What the trial lawyers knew, both of whom are deceased, neither of whom can explain conduct that happened 30 years ago, what the trial lawyers knew was that Benson has said, it's in the record, the time at the farm was among the happiest time of life, that the mother figure in his life was the foster mother, not his biological mother. So let's talk about what I want to just address while we can, Benson's arguments regarding the deficiency. I know you're talking about that, but I have some questions I want to ask you and get your response because it seems like based on, and they're pointing to Ms. Ballou's declaration, I believe, it appears counsel was minimally involved. I want to retrieve, if I can, the two declarations. Okay. While you do that, I mean, just because it seems like they're alleging, based on this declaration, that counsel did not actually hold meetings with Benson so that he might be able to develop further mitigation evidence. It also is alleged that counsel ignored repeated requests by the investigator to continue when the investigator told him that she could not finish Benson's mitigation. Both these seem similar to the Correll case and to the Allen case, and I'm just trying to figure out what your response is. They're not similar for several reasons. First of all, what do we know from this penalty phase? Again, looking at it in terms of what Strickland says, Strickland, which is, I think, a commonly misunderstood case, Strickland is a case where a lawyer made a phone call. That was the lawyer's mitigation evaluation in Strickland, making a phone call. This is a case in which these lawyers are not only communicating with their client, they're communicating with two of his brothers at a minimum. I'm talking only about the penalty phase now. They're communicating with his sister. They're communicating with other relatives. They identify a teacher. They bring in mental health experts. There is no case that I'm aware of, the ones that you've identified, the recent Andrews case, which I cited in supplemental briefing. I know you're on the panel in that case, Your Honor, at work. There is no case in which a reviewing court says, notwithstanding the fact that all this work was done, that there was an attempt to explore thoroughly the defendant's background, that because one can allege, allege in hindsight, when these lawyers are dead, Dorothy Ballew's declaration is dated after the death of trial counsel Kenneth Beley. But the sexual abuse, I mean, it seems like it goes to the heart of mitigation. And so I'm just finding it, I want to make sure I understand your argument why it was okay and not deficient for the lawyer to zero, like a laser focus on that sexual abuse. I mean, based on what the crime scene was here, it seems like there might have been issues with Mr. Benson, the petitioner. I think that a reasonable trial lawyer in 1986 could evaluate a case based on conversations with his client, his client's family, a psychiatrist, an expert on drug use, et cetera, and decide that the portrait that was going to be presented was a compelling one. It was one that Benson's state appellate lawyer described in the briefs as awful, or words to that effect. Now, to say in hindsight, well, as though it is a fact that trial counsel made a conscious decision not to pursue mitigation based on sexual assault, there's no evidence of that, isn't there? Look, we have Investigator Ballew telling trial counsel that she suspected abuse. She's telling trial counsel that Brad Benson told her that he was sexually abused at the farm. We have Mr. Kellogg, the family therapist, telling counsel that he thought Mr. Benson was previously abused, and it just seems that the experience of most people, I would imagine, like the trial counsel, that someone is sexually abusing, they've likely sexually abused themselves, and it seems odd that it's during the penalty phase that they're just, you know, finding out about this. It's being revealed that Brad, the brother, was sexually abused, and no one stops and says, huh, wow, even despite what, because we have case law that says despite what the petitioner is saying, maybe this is an area that we need to really focus in on that might explain and offer mitigation. When these interactions happened between this lawyer and his client, none of which are known to us, and they happened 30 years ago, and none of these cases had been decided, and none of these cases had held that, and I submit they still do not hold that if a compelling, thorough mitigation case is presented, assuming that there was a conversation that took place, for all we know, Benson denied it. Benson to this day doesn't allege that it happened. But he says, I'm the product of my environment, and he talks about the foster, it seems like when Brad Benson says that, and you know that Mr. Benson, the petitioner himself, says I was farmed out in bad foster homes and stuff, it turns out I'm a product of my environment. I don't know why that doesn't send off bells and whistles to somebody at that point when you're in the mitigation stage to say, wow, I wonder if we need to do more to offer up. I'm sorry. Because we are still surmising, and it's not apparent in what I'm looking at, it is not apparent in Ballou's declaration, I'm looking at excerpt 671, it's not apparent in Brad Benson's declaration at 541, Brad Benson is talking to trial counsel. Brad Benson testified. Brad Benson described their childhood and how things got worse after the foster care, after the farm. If, lo and behold, this was a myth, if Brad Benson was concealing from trial counsel what occurred there, there is no basis on the facts as they are known in this record to decide that trial counsel intentionally turned a blind eye to information he probably never received. But there's a declaration that this was discovered during the penalty phase. Again, I am at a loss in looking at Ballou's declaration. Is there actual evidence that anyone really knows anything during the penalty phase or that they're just suspecting? I would submit there's not evidence really that they're suspecting. I have to say, because in reviewing the briefs, I frankly didn't anticipate Dorothy Ballou would be a prominent part of this as much as she has. I would like to point out there is a published case in the district court tried at approximately the same time as this case. Lang is the petitioner, Kenneth Burton Lang. I know the case because it was my case. It's another capital case tried at approximately the same time, and the investigator, Ms. Ballou, says the same things in that case, that she was in charge, in effect, that these lawyers were incompetent. None of these allegations that she makes in this case, for example, if she was suspicious of counsel's performance, there's no contemporaneous identification from her that more needed to be done. Where in the record, other than her decades-removed statements, is there an indication that she brought anything to counsel's attention, or that counsel was, in fact, insensitive to other mitigation issues? But Judge McGee... But I guess what I'm saying, if it's at the review, we have to look at it in terms of, basically, could they have gotten where they got? And so what actually... So that's why, in terms of what was actually known to counsel at the time, we know counsel hired some mental health people, we know they hired Ballou, we know they were talking to people in the family, and all of those things. From evaluating it, is there anything in the record that actually shows that counsel, for the petitioners, knew that he had been brutally molested at the farm? I am not aware of any witness or any evidence that establishes that. I am not aware of any indication that counsel, as a strategic matter, decided not to present sexual assault evidence. That, I don't believe, is in this record. However, because... So you're saying there's no strategy reason, it's just lack of notice? No, and that was my next point, Your Honor. Okay. Because she does say in her declaration that, during the penalty phase, she learns about Brad's sexual abuse. She has been suspecting that the petitioner was sexually abused as well. And so I guess your position, that's just not sufficient notice. My position is, she's not his lawyer. I understand, but she's saying she told counsel. She may have suspected any number of things. What we don't know, because of the passage of time and the fact that people are deceased, is we don't know what counsel's perspective was vis-à-vis whatever she told them. So you're saying that there could have been a strategy at that? That's what you're saying, then? That there could have been a strategy that counsel, despite assuming that he heard about that the investigator had been working on this and that Brad Benson, the brother, had been sexually abused, decided strategically not to bring that out? Yes. There could have been. But you can't call a witness in a penalty phase. You can't put Ballou on the stand and say, do you suspect he was abused? Absolutely. I mean, there's no basis for it. She can't speculate as to that. My point is, as a hypothetical, if Mr. Bailey or Mr. Patangelo knew what – I don't think there's any evidence that one can plausibly assert that they knew. There may have been – and Strickland speaks to this, much less the ADPA. There could have been any number of reasons why they would decide, with a penalty phase that I submit, unlike your description of the Andrews case, unlike so many other cases, is so elaborate, is complete, is not a picture of a little boy on a farm. That is not what they heard. And finally, because – But you just – so you acknowledge that, okay, Richard Benson may have told the investigator and the investigator may have told the defense counsel, but that's still not enough. But it seems like that's classic mitigation evidence in these types of cases for – and, you know, that the defense attorney would have ignored. So I know your time is running, but let me just – let me just ask you – You can take all the time. We have plenty of time. Okay, thank you. If you – just bear with me for just a minute. Would you agree that there is a reasonable probability – or disagree – that there's a reasonable probability at least one juror would have voted for life if the jury had heard Mr. Benson's two brothers testify to this terrible physical and sexual abuse that the Benson boys endured at the Buchanan farm? So I'll end with that then. I might have another question, but go ahead. All right. Well, I'll end the first part of it. So, again, the limitation is the extremely hypothetical nature of this. However, I think that to the extent that one can assess cases and one factors in the deference that is required in this case in terms of the evaluation, to say that it is reasonably probable in a situation in which an extensive mitigation case was presented involving abuse, neglect, the impact of drugs, abandonment, a totally chaotic life, a life spent in prison and incarcerated and with no responsible adult ever in one's life, et cetera, alongside what is – what are facts of a crime that one cannot really even comfortably discuss even in a court of law involving all of these murders and murders of these children. Including the type of the abuse the Benson brothers suffered, the sadistic abuse that they – and the obvious rejoinder, which is that those brothers, by the way, so what became of them? They went into the military. They developed careers. One overcame a drinking problem. They became successful in life. They didn't become homicidal pedophiles. To say that it is reasonably probable that any death-qualified jury would give Benson life, I think is certainly well beyond the standard of review that controls in this case. Well, let me just – don't worry about the time because we're going to ask the questions. So the way that Judge Merguia stated, would you frame the standard of review the same way that she stated it, that one person could give LWOP? If you're under AEDPA, what are we reviewing? Okay, we had seven, what, Supreme Court justices that under AEDPA said there's no – they denied on the merits under Strickland. I would state it perhaps a little bit differently. Okay. Well, no, I mean, but framing the issue – how would you frame the issue under AEDPA? The issue under AEDPA would be whether or not the petitioner has demonstrated a reasonable probability that had counsel proceeded in the manner that is proposed, by the way, because I can't resist, with experts that were recruited over many, many years, right, not within the timeframe of a trial, not within a one-year period, not local experts, but people identified from around the country and family members who apparently, if we indulge this, these statements, family members who make statements that are inconsistent with their testimony under oath in a penalty trial. With – confronted with all that, is it reasonably probable that a jury that unanimously found that death was the appropriate verdict for four murders and all of these sexual assaults? It is not. The jury got – they had an understanding of what happened to him. They got a thorough understanding that I submit differentiates this case from every capital case this court has reviewed. Mr. Glassman, may I interrupt you for a second? Are you agreeing that what we have to decide is to look at the evidence and determine whether it would be reasonably probable one juror would have voted for LWOP to adopt Judge Callahan? I don't think that's a – No, you're right. We have to look at whether the state supreme court determination that it wasn't reasonably probable. And it's my – Was unreasonable. Correct. I am in no way claiming that this court conducts an independent evaluation of what is a reasonable verdict. The question is reviewing – What is a reasonable probability? Correct. Of that verdict. The question is whether – And that's all my question was. I understand the double deference. I just wanted you to answer that particular. I understand there's another question that we have to resolve. And I would say that, by the way, if these facts were undisputed. I would say that these facts were undisputed. My point is that what we are engaging in at 671, at 541, or wherever else in these excerpts, is this parsing of information in order to attribute some knowledge to counsel that I don't believe this record fairly allows. How old is the petitioner? What's his date of birth? I couldn't find it. What? He was 38 at the time of the crime. Oh, okay. So he's – 68. 68, I believe, or approximately. Well, I was sort of looking by when he – because he had the four convictions. And when he got out of the youth authority and all of those, I figured he was in his late 60s. But somewhere – I believe he's 68. Well, whether it's mine or not, it's important, I think, to remember in this case that beyond these murders, which are horrific – and this is something that the jury would have known, obviously – as soon as he's killed the family, he kidnaps a woman. So it's not just the four priors and the murders and the sexual assault. It's another kidnapping with a hostage. So the enormity of his conduct, I think, almost can't be overstated. Could a state Supreme Court, on a fragmented record of allegations like this, come to the conclusion that he had not demonstrated a reasonable probability of relief in the penalty phase? Absolutely. You make excellent points. I don't disagree with anything you're saying. I'm just trying to dig as much as I can because this is an important stage for Mr. Benson. So another additional question I had, it seems like the trial counsel – and it's in the record he was focused on the penalty phase here at this trial. And he decided to focus on that time when he was with his father, which turned out to be just a year, when this time at the foster farm here was zero to nine years. And it turns out, when you look at the Benson brothers' declarations, what happened there was really significant in terms of potential mitigation. And I understand the notice here, but you had at least Mr. Kellogg, aside from the investigator if you want to discount her, telling him that there's suspected sexual abuse. So I'm just trying to figure out whether this life with the father, doesn't it pale in comparison to the Buchanan Farm abuse? So a couple of things. First of all, to the extent that counsel was focusing on the penalty phase – Well, I think he said that at one point. That is only a point in his favor, both of them, because they recognized, you know, habeas petitions don't look like trials. They recognized this case would come down to penalty. With respect to the focus within the penalty phase, and I appreciate that Your Honor is identifying information in which other allegations are made, but I think that when one reads the penalty phase in context and completely, these lawyers were trying to portray a terrifying and abysmal life. And within that life, in terms of exactly what happened at the farm, we know from contemporaneous information, not after-the-fact allegations from interested parties, we know from contemporaneous information that life on the farm is described in positive terms, under oath, and by Benson in his statements to the psychiatrist. But also, too, you pointed out if you were to create this other, that if Brad Benson then were to come forward and state these other things, he would be impeached with what he had stated previously, but also all of the family members that endured this did not turn into the person that the petitioner turned into. So those would all be things that when we're talking about creating, that we want to create this, you know, we want to say this is why he did what he did, then you put right next to it these other people, the same thing happened to them, and they didn't do that. That's why Strickland says there is respect, not without limitation, there is an understanding of what a lawyer who is defending a case is dealing with that does not necessarily leap out of the appellate record. And to say in this case when we have from the interested party, to put it mildly, when we don't have corroboration from Benson himself that these things happened to him, much less do we know what communications he had. We have case law that says that we don't have to rely on, that counsel shouldn't rely on the petitioner themselves. Never in a case I submit where so much work went into presenting a penalty face. So this isn't the lawyer in Strickland making the phone call. These lawyers are intent on presenting a comprehensive penalty face. And I would just ask the court finally, so even if there were, for example, strategic reasons why one might fear the backlash of the kind of testimony that I'm describing, given that we know that they were interested in obtaining relatives, obtaining experts, telling the story of his life, there is nothing objectively in the record in this case that would allow one to conclude that either of these lawyers nevertheless decided, no, wait a minute, I don't want the most compelling evidence. I want to put on more marginal or less persuasive evidence. They were determined to save his life. They put on the results of a lot of work on their part to locate these people, to bring them in, to find experts. I think that it begs reality to say that if they knew that there was more plausible information out there, they wouldn't have used it unless, for example, they were given much different information beyond the record. And, of course, we don't know what we don't have in our record.  So I didn't get a chance, but it's been highlighted by both Judge Callan and Judge Bea. Yes, there are. That additional layer of, you know, I asked you the first question, would it have been reasonably probable for one juror, had they known this information, to come out differently. I got your answer on that. But then we had the additional layer of whether a fair-minded jurist, whether it could be debated, would have found this reasonable. And so let me go ahead and ask them. I think you've already sort of hit this, but I just want to get your full position here. Thank you. On whether it was reasonable to sentence Mr. Benson to death when this compelling evidence that he argues goes to the heart of a mitigation was never presented to the jury. First, evidence has to be demonstrated in a record. So with the excerpts that I've identified, subject to somebody else telling me what else there is, that we can sort of hypothesize what counsel might have concluded may be happened to Richard Benson, despite the fact that Benson didn't corroborate it, the psychiatrist, you know, the lawyer is entitled to defer to an expert whom he retains to evaluate the defendant. There's no indication from Dr. Abel, the psychiatrist, that any of this occurred when he testified. That's his job, to figure out who he's evaluating. That didn't happen. So I don't acknowledge, I don't concede that this was withheld from a jury. But even if it were, in the worst-case scenario, even if it were, yes, I think that on that continuum of culpability that this court has talked about, that Benson is beyond the pale and that this kind of information would not significantly alter the assessment of him by any juror. But as I was correctly corrected, the issue is, could the California Supreme Court have decided that, regardless of whether another fair-minded judge would come to a different conclusion? And the answer is absolutely yes. Thank you for your argument. Thank you. Okay, so in light of the questions, I'm going to give you 15 minutes for a rebuttal. So are you going to be using it all, do you think? Your Honor, Mr. Grayley just asked me if he could have three minutes. Okay, well, he can have three of the 15 I'm giving. Mr. Grayley, do you want to go first? Would you rather go first? Okay. I just wanted to be very brief. I didn't expect even three minutes. First of all, Anderson says that it was clearly established law that the remedy is suppression of a confession. Anderson versus Calderon, and I've said it in my brief, it does say that the remedy for a violation of a Fourth Amendment right to presentment is suppression, and it relies on a clearly established Supreme Court precedent for that because they had the T question before them at the time. ADPA does not apply to the Fourth Amendment claim because the state Supreme Court did not rule on the merits. Instead, they said it is not a cognizable claim in habeas. It also doesn't apply because at the hearing below, and it's in the transcribed record, counsel attempts to present these facts and he's shut down, and one thing he doesn't allow to present is what the district attorney told the police officers were the reasons why Mr. Benson was being withheld from court. It's not a fair hearing. It's not entitled to deference under 2254 D1. Finally, Mr. Martel's deposition, he has his 1986 file. We know what's in it and we know what's not in it, and what's not in it is any indication that a parole hold was in fact placed. Thank you. Okay, thanks. Your Honors, challenging crimes and challenging aggravation required trial counsel to rise to the challenge in presenting mitigation. Trial counsel did not do that. The standard of care back in 1987 when Mr. Benson was tried was the 1980 edition of the ABA Standards for Criminal Justice, which required counsel to explore all avenues leading to facts relevant to the penalty in the event of conviction. The standard in the mid-1980s in terms of handling death penalty cases, I was handling death penalty cases at that time. The standard was somehow not, it wasn't undeveloped. There was a clear statement of what trial counsel would be required to do, much like the Supreme Court found when they considered Wiggins v. Smith, which was a trial in 1989, so that there was no kind of substandard there that isn't present now because we've evolved more. I'd like to address Mr. Glassman's comments about the mitigation that was presented at trial. Brad Benson was called. He last saw his brother 21 years before. Dale Snow last saw his brother 29 years before trial. Sandy Benson, Sandra Benson, who was called, last saw Petitioner 30 years before trial. They didn't call the other siblings, which is significant. They didn't find them. They didn't find one bill who was living in Santa Cruz at the time. Holmes Benson, who is Mr. Benson's uncle, met Petitioner five times in his life. He testified that the father was an alcoholic. Mary Pat DeGroote was a nurse who had treated Dale Snow for alcoholism. She never met Petitioner. She testified that alcoholism is hereditary. Gregory Hayner, a doctor, testified about the effects that drugs would have on Richard and initially said that he appeared to be hallucinating and hearing things while he was in the Camargo residence. He later admitted that he hadn't even listened to the tape of Mr. Benson's statements to the police and that if, in fact, the walls were bowing and if people were knocking at the door in reality, then anything he had to say was worthless. We had Grace O'Brien, a teacher who had known Mr. Benson for four months in junior high school, testified that he said nobody believes him, and that allowed the prosecutor to continue to assess that Mr. Benson, who has severe memory gaps and can't remember things, was lying. Can you respond to Mr. Glassman's argument, though, that here the two brothers apparently suffered similar, if not the same, abuse and they haven't gone out and committed these sort of horrific crimes? That is often true in capital cases. There are individuals within a family who, for whatever reason, do not have the resources, do not have the inner strength to carry on like the brothers did. I don't know that the brothers are that functioning. Both Bill and Brad Benson drank themselves to death, and they explained their situation in their affidavits. This is not a high-functioning family. I asked Mr. Glassman many questions regarding why there would not be prejudice here, and I'd like to ask you the question as to why there would be prejudice here applying our double deference under Strickland and AEDPA, because let's assume as true all this new information about Mr. Benson's childhood abuse and cognitive impairments, there are still a great number of aggravating factors in this case. In fact, this case is probably unique with respect to the aggravating factors. Mr. Benson has four priors involving kidnapping or molesting young girls. His crime in this case involved three innocent children and their mother, who was brutally killed and sexually abused. On top of it all, there was also a subsequent kidnapping. It seems like this case goes pretty far with respect to the aggravating factors, and so let me ask you whether and what's your best case that fair-minded jurors could disagree that the state court's decision conflicts with the court's precedence in light of these aggravating factors. Your Honor, I believe that fair-minded jurors cannot disagree with the proposition that these were horrible crimes, but Mr. Benson came up in a horrible environment, and there is a direct relationship between what happened to Mr. Benson as a child and these crimes. And I think that if the mitigating explanatory evidence had a nexus to the crimes, I mean, mitigation does not need to have a nexus to the crimes. We know that, but in this case, there is a direct nexus. Well, there's kind of some other aggravating circumstances, too. He didn't really need to kill the kids because they couldn't have even identified them. They couldn't qualify as witnesses. They were, what, four, three, and I think 22 or 23 months old, and I think that I don't know this for a fact, but I have a feeling that that's why some of the specials were stricken because I think he was convicted of killing witnesses or something. Yes, Your Honor. But, you know, three- and four-year-olds and 23-month-olds aren't going to qualify as witnesses, so he didn't even need to kill them, and he did. And he burned the house down. And in a methamphetamine, with a brain damage methamphetamine user, I'm not sure that, you know, Your Honor's way of thinking about things can be attributed to Richard Benson. No, I don't think you can, but when you're talking about jurists and what the jurists think like I do, the jurors think like I do, and so when we have to look at prejudice and all of that, that those are all things that really, you know, that it's uber-aggravation. Your Honor, I think this court, in aggravating cases, has recognized sexual abuse and its relationship to the crimes as very important evidence. In Morton v. Chichapel, the court found that a juror, this was a case where the defendant was charged with murder. There was a prior murder in aggravation as well as the rape of an older woman by a much younger man. The court says that a juror might have seen the prior murder as stemming from repressed anger about the homosexual rapes of Petitioner by his father and step-grandfather, and a juror might also have seen the rape of a 61-year-old woman by a much younger Petitioner as stemming from a childhood filled with rape and sexual abuse across generations committed with impunity. And in Doe v. Ayers, the court reached the same conclusion. It noted the causal nexus between the mitigation evidence of the defendant's abuse and the crimes, and it said that evidence of sexual victimization would have offered the jurors a way to understand, though of course not justify Doe's aggression as a product of repeated brutalizations that left him suffering from PTSD. I will say, Your Honor, What's your best case that matches or comes close to matching the aggravating factors here that was successful? I think that in aggravating, I think Terry Williams, the case reversed by the United States Supreme Court, there was substantial aggravation, assaults on elderly victims, one of whom was in a vegetative state, not expected to recover, an arson conviction for setting fire in the jail while he was in trial, and testimony that there was a high probability that Williams would pose a serious continuing threat to society. Your Honor, I think that the notion that no amount of mitigating evidence can ever matter in a case like this is contrary to United States Supreme Court jurisprudence, which has consistently rejected a categorical approach to the death penalty. In this case, Justice Frankfurter once said that a shocking crime puts law to its severest test, and I think that's true, but judging by the standards that apply in every capital case, even the ones that are not so aggravated as this, those standards apply here. What's your best case on notice? On notice? On notice, that the lawyer had notice. The best case on notice is Dorothy Ballew. Best case, the authority, your best case, not the best facts. Oh, the facts? Well, I think notice is a very fact-intensive issue, so I think it depends on the facts in the case. I understand, so give me your best case on the facts. On these facts for notice? Yes. I think that the court's decision in Wharton and the court's decision in Doe v. Ayers, both of whom, both of those decisions rely heavily on in cases involving, you know, I would also say that the court looks closely at the witnesses that were called at the penalty phase. I think the court will conclude that not that this was a wonderful penalty phase that was presented, but these witnesses strongly resemble the witnesses in Allen v. Woodford, that the court, that were proffered on habeas and that this court said those are not good witnesses. They are people who knew him long before the crime. They didn't explain anything. Well, how could Brad have not been a good witness because Brad was there at the ranch when he was there? I mean, Brad would be, he would, you would be purporting to call Brad at this point. Brad would have been called, but he certainly would have been questioned in a different way than he was. I know, but Brad's a good witness. You can't say Brad's not a good witness. Well, Brad is a good witness for their purposes. He's not a good witness to show what their lives were really like. There's a whole different thing. Brad was good if you posit, if you take the district court's position that, well, they reasonably chose to present this as a nice little boy who had gone wrong. That is, that, by the way, is not trial counsel's statement about it. Trial counsel said that none of the evidence that would have been presented, that we have presented, that we came up with on habeas, none of that would have been inconsistent with his defense at trial. And he also said that if he had known about organic brain damage, he would have presented that evidence. So it's a difficult case. It's difficult because of the nature of the offenses. It's difficult because of the aggravation. But when you look at what made Richard Benson, and when you consider what happened to him as a child, it all becomes understandable. And perhaps one juror would have recognized that Mr. Benson is not a danger to the public. Perhaps. Not a danger to him. Perhaps. But the question is, was it unreasonable for a unanimous California Supreme Court to say no? I believe it was, Your Honor. He could be confined safely. Don't you agree with that? We don't know what the problem is. There is, again, if we assume that this is so bad that it can't be mitigated, that approach doesn't work. Well, Mr. Benson's problem was a little more than just children because he kidnapped a woman after, and he also killed the mother who was not a juvenile. That woman was also kidnapped. It's a strange case, the case of Karen Stang. But he also told her that he was on a mission to rescue children from a suspended police officer who was forcing his family to make pornographic videos, and that he had a supercharged car in the back of a house that would allow him to catch this woman. So Mr. Benson, at the time of that offense, I think was clearly psychotic. No, he could be just a plain liar and a fantasist. It's a pretty strange fantasy. Thank you, Your Honor. All right. Thank you both for your arguments. This matter will stand submitted. This court will be in recess until tomorrow morning at 9 a.m. Thank you.
judges: Callahan, Bea, Murguia